# **EXHIBIT C**

Production Agreement and License

**PRODUCTION AGREEMENT AND LICENSE**
**(Menopause The Musical®)**
**and**
**(Menopause The Musical® In Concert)**

This PRODUCTION AGREEMENT and LICENSE is entered into as of this 1st day of November 2011, concerning the production and presentation of the show Menopause The Musical®, Menopause Out Loud®, Menopause The Musical® In Concert, and Menopause Out Loud® In Concert by and between the following: J. JARGON COMPANY (the "Owner"); JEANETTE C. LINDERS (the "Author"); and GFOUR PRODUCTIONS, INC. (the "Presenter").

**BACKGROUND**

A.      The Author is the creator of the show Menopause the Musical® ("MTM"), a/k/a Menopause Out Loud® ("MOL") (collectively, MTM and MOL are referred to as the "Show").

B.      The Author transferred her rights to the Owner, and the Owner is now the owner of all right, title and interest in the copyright in the Show.

C.      The Owner is also the owner of all right, title and interest in and to the trademark applications and registrations listed in Schedule A (the "Marks") in the country/countries listed in Schedule B.

D.      The Owner is also the owner of all right, title and interest in and to the copyright registrations listed in Schedule C ("Copyrights").

E.      The Owner is also the licensee under the music copyrights listed in Schedule D (the "Copyright Licenses") in the United States and Canada.

F.      The Owner has created a derivative work, Menopause the Musical® In Concert ("MTM-in Concert") and has presented MTM-in Concert to the public.

G.      The Owner previously licensed the Presenter to present the Show in various

{22787363;1}

venues pursuant to various agreements.

H.      Disputes arose with respect to the prior agreements and the parties' respective obligations thereunder.   Those disputes have now been resolved pursuant to a Settlement Agreement, and the parties enter into this Production Agreement and License, which fully replaces, extinguishes and supersedes all prior written or non-written agreements or understanding with regard to the presentation of the Show by the Presenter.

## ARTICLE I.  RIGHTS

1.1.      Subject to all of the terms and provisions stated herein, the Presenter is granted the exclusive right and exclusive license to produce and present the Show, MTM-in Concert and MOL-in Concert (collectively MTM-in Concert and MOL-in Concert are referred to as "Menopause--in Concert") before live audiences in theaters in the Territory (described below) during the Term set forth below.

1.2.      Subject to all of the terms and provisions stated herein, the Presenter is granted the exclusive right and exclusive license to copy and use the Copyrights, the Copyright Licenses and the Marks before live audiences in theaters in the Territory (described below) in connection with the Presenter's presentation of the Show and Menopause-in Concert for the Term (set forth below).   The Owner has obtained licenses for the parodied songs in the United States and Canada.  In all countries beyond the United States and Canada in the Territory, the Presenter shall obtain all necessary licenses to perform the parodied songs in each country where the Show is performed. The Owner shall, at no cost to the Presenter, cooperate in good faith in the Presenter's efforts to obtain such licenses.  In any country for which Presenter is unable to obtain such licenses, Presenter shall have the right to license replacement songs and create parodies within the scope of the replacement license.

1.3.    The Presenter is granted the right to translate the text, songs and lyrics as needed, into foreign languages, provided that all proposed language translations must be approved by the Owner in writing (such approval not to be unreasonably withheld).

1.4.    The Presenter is granted the right for the Term (set forth below) to use currently existing MTM mailing lists to market the Show and Menopause-in Concert.

1.5.    The Presenter is granted certain internet marketing rights, including the right to create a website and Facebook site for the Show and for Menopause-in Concert.

1.6.    The Presenter is granted the exclusive merchandise rights in the Territory (described below) for the Term (described below).

1.7.    The Presenter has the right to assign, sub-license or otherwise authorize a third party (including, inter alia, any wholly-owned subsidiary and/or any affiliate of the Presenter) to use the rights licensed to the Presenter pursuant to this Agreement, provided (i) the assignee, sub-licensee or user has first specifically agreed in writing with the Presenter to be bound by the terms of this Production Agreement and License, and (ii) the Presenter provides the Owner with a fully executed copy of the writing evidencing the assignment, sublicense or other entitlement. Any assignment, sub-license or authorization in violation of this provision shall be void.

1.8.    All rights not otherwise specifically granted to the Presenter by this Production Agreement and License are reserved entirely to the Owner.

1.9.    The Show shall be presented in substantially the form as produced by the Presenter immediately before this Production Agreement and License (which the Presenter shall document with a DVD of the complete show within 30 days of the next presentation of the Show

outside of Las Vegas[1] and send to the Owner), without substantial changes, additions or alterations in or to the title, book/text, songs, lyrics, trademarks and/or copyrights, unless approved in advance by a written instrument signed by the Owner.

1.10.   Menopause-in Concert shall be presented as designed, with modifications as Seth Greenleaf deems appropriate for an in-concert version of the Show.

## ARTICLE II.   THE MARKS

2.1.   The Presenter agrees to use the Marks only on and in connection with the advertising, marketing and promotional activities for the Show and Menopausein Concert, and in furtherance of its merchandising rights (set forth below).

2.2.   The Presenter admits the validity of the Marks and agrees that all rights in the Marks inure to the benefit of the Owner.

2.3.   The Presenter agrees not to use or register any Marks in any jurisdiction in the world that resemble or are confusingly similar to the Marks.

2.4.   The Owner either has or shall provide graphics, sample print radio and television advertisements with the Marks to the Presenter, which Presenter may use in all media, including the Internet (hereinafter "Marketing Materials").

2.5.   The Presenter agrees to use the ® after all Marks.  Any form of use of the Marks not specified by the Owner may only be used by the Presenter with the prior written approval of the Owner.

2.6.   The Presenter shall use the Marketing Materials only in full compliance with the provisions of this Production Agreement and License.

---

[1]  The parties acknowledge that the Las Vegas Show has been, and will continue to be, presented in a different format than the version that will be documented in the DVD recording of the touring production outside of Las Vegas. The Las Vegas Show as currently produced is approved by the Owner for the Las Vegas venue only.

{22787363;1}

## ARTICLE III.   THE COPYRIGHTS

3.1.     The Presenter may use the Copyrights and Copyright Licenses only in the Territory for performances viewed and heard by audiences in the immediate presence of actors.

3.2.     The Presenter may translate the text, songs and lyrics as needed into foreign languages on condition that all proposed language translations must have received the written approval of the Owner (such approval not to be unreasonably withheld).

3.3.     The Presenter acknowledges that all derivative works of the Show and any changes to the Show that are not derivative works are the property of the Owner and, absent agreement in writing to the contrary, shall remain the property of the Owner.

3.4.     The Presenter agrees that it will not apply or otherwise seek ownership of the Copyrights in any jurisdiction and will not challenge any of the Owner's rights in any of the copyrighted works anywhere.

3.5.     The Presenter shall not authorize any recording (except as provided in Section 1.9 above for archival purposes), filming, televising, broadcasting, uploading or downloading on the Internet or any other reproduction of the Owner's Copyrighted works, except that the Presenter may authorize and release B-roll for marketing and publicity purposes, provided that such B-roll complies with all applicable rules of the Actor's Equity Association.

3.6.     The Owner agrees to pay, and assumes all risk and responsibility for the payment of, all necessary fees in connection with the production and presentation of the parodied songs in the Show in the United States and Canada and to provide the Presenter with proof thereof contemporaneously with such payment.  If Owner does not pay such fees in a timely fashion, then the Presenter may do so directly and deduct such amounts from royalties due to Owner for this purpose.

## ARTICLE IV.  TERM

4.1.    Subject to the termination provisions set out below, the term of this Production Agreement and License (the "Term") is from November 1, 2011 through December 31, 2018, except for Las Vegas, Nevada, where, subject to the termination provisions set out below, the Term is through December 31, 2022.

4.2.    This Production Agreement and License is valid only for the Term (as it may be extended by the parties with written agreement or shortened as set forth hereinafter).

4.3.    Upon expiration of this Production Agreement and License (or the earlier termination as set forth below), all rights licensed to the Presenter under this Production Agreement and License shall automatically cease and shall automatically revert to the Owner in full.

## ARTICLE V.  TERRITORY

5.1.    The Presenter will have the right to produce and present the Show and Menopause-in Concert in and throughout North America (including Canada and Mexico) and South America,[2] but excluding Orlando, Florida, and an area having a radius of 50 miles from the Orlando City Hall.

## ARTICLE VI.  EXCLUSIVITY

6.1.    Subject to the terms and conditions of this Production Agreement and License, the Presenter's right to produce and present the Show and Menopause-in Concert before live audiences in theaters in the Territory for the Term, and to use the Copyrights, sublicenses to

---

[2] The parties acknowledge that the Owner previously entered into a License for Term and Territory for Brazil with LP Pontes Producoes Artisticas E. Culturais (the "Brazilian Licensee"). That agreement expressly provides that *"This License is subject to licensee opening the Show in Sao Paulo, Brazil no later than 29 March 2010."* The Owner represents that the 29 March 2010 opening date was not met and that, so far as it knows, no Show has been opened anywhere in Brazil. The Presenter agrees to assume the risk of proceeding in Brazil and agrees to hold the Owner harmless from any claim by the Brazilian Licensee.

Copyright Licenses and Marks in connection with such live audiences shall be exclusive.

6.2.    The Owner will not have the right to produce or license for production derivative or substantially similar shows (including, *inter alia*, MTM-in Concert or Menopause Extreme) in the Territory during the period of this Production Agreement and License, except with respect to the pre-existing and currently booked or running MTM-in Concert shows through the end of 2011.[3] The Owner's violation of this provision shall be a material breach of this Agreement.

6.3.    In the event of any infringement or violation of the Presenter's exclusive rights and exclusive license under this Production Agreement and License, the Presenter may employ such remedies as it deems advisable to protect its interests.

### ARTICLE VII.  OWNER'S APPROVALS

7.1.    All Shows produced and presented under this Production Agreement and License shall be presented to live audiences in theaters in the Territory (i) in substantially the form that the Show is currently being produced by GFour, as shown by the DVD to be made and sent the Owner as set out in Section 1.9, and (ii) in a form that is consistent with the Copyright Licenses.

7.2.    All productions of Menopause-In Concert under this Production Agreement and License shall be presented to live audiences in theaters in the Territory in a form (i) derived from and substantially conforming to the current GFour production of the Show, and (ii) that is consistent with the Copyright Licenses.

7.3.    Any material changes to the music or the creative team (director, musical director, and/or choreographer) shall be submitted in advance to the Owner for approval, which approval shall not be unreasonably withheld.  Further, Seth Greenleaf as director and Daria Melendez as choreographer have previously been approved and no further approval is required for their

---

[3] Orlando, Florida, and a 50 mile radius from the Orlando City Hall is not in the Territory although surrounded by the Territory, and the Owner reserves the right to produce all Shows at all times in all areas not in the Territory, including Orlando.

{22787363;1}

continued participation. Except where expressly provided in this Production Agreement and License, no Owner approval shall be required for anything else during the Term of this Agreement.

    7.4.    The Presenter shall indemnify and hold harmless the Owner for any claim by any third party that the Presenter's production and presentation violates or invalidates any Copyright License.

    7.5.    Except where the Presenter has submitted a written request for approval as required under this Production Agreement and License, the absence of any objection by the Owner to any change, addition or alteration to the title, book/text, songs, musical compositions, lyrics, choreography, trademarks, copyrights, staging, creative team or general creative quality shall not constitute or be deemed an approval.

    7.6.    Wherever the Owner's prior approval is required under this Production Agreement and License, the Owner's failure to respond to the Presenter's written request for approval within 30 days of submission shall be deemed and shall constitute approval.

## ARTICLE VIII.  COMPENSATION



████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

8.3.    The term: "Net Adjusted Gross Weekly Box Office Receipts" (NAGWBOR) shall mean all sums actually earned and received from all sources whatsoever, derived from the sale of tickets to the Show after the deduction of only the following:

(a)    Any national or local taxes or any similar taxes, which are imposed on admissions;

(b)    Any commissions paid to unrelated third parties at customary and industry standard rates in connection with theatre parties or benefits, such as group sales, credit card sales, benefit discounts, automated ticket distribution, and remote box office sales (e.g. Ticketmaster), etc.;

(c)    Those sums, if any, which are set aside for pension or welfare funds, of theatrical unions and ultimately paid to said funds;

(d)    Subscription fees, discounts and so-called "theatre restoration charges," if any, and reasonable booking fees;

(e)    If applicable, all sums imposed and paid as part of venue restoration or theatrical production funds approved in writing in advance by the Owner;

---

[4] For Mexico and South American countries, the Presenter shall negotiate and contract with, and pay music royalties directly to, the licensing entities for the applicable country.

{22787363;1}

(f)     Sums included as NAGWBOR in a prior performance week which were included for purposes of the royalty calculation but which were subsequently refunded or uncollectible due to dishonored checks, invalidated credit card receipts or for any other reason;

(g)     Any amounts received for Charity Performances, which were paid over to the applicable charity.

8.4.    No other royalty shall be paid to the Owner and all profits (or losses) shall be for the Presenter's account. All Shows from November 1, 2011, until the conclusion of the Term shall be governed by the provisions of this Production Agreement and License, even if this Production Agreement and License is not signed until after November 1, 2011. All author royalty payments made by GFour to the Owner for Shows produced after November 1, 2011 and before execution of this agreement shall be credited toward the $1.25 million payment due on or before May 28, 2012 as set out in Section 8.1 above.

## ARTICLE IX.  MERCHANDISE, WEBSITES AND SPONSORSHIP

9.1.    The Presenter shall have the exclusive right to sell merchandise related to the Show in the Territory from sources of its choice during the Term of this Production Agreement and License, with all revenue from the sale of such merchandise in the Territory, including from websites (e.g., Menopausethemusical.com; Menopauseinconcert.com; Menopauseoutloud.com; Menopauseoutloud.ca), and any websites created by the Presenter pursuant to this Agreement being for the Presenter's account.

9.2.    The Presenter shall purchase the Owner's existing saleable merchandise at the Owner's cost. "The Owner's existing saleable merchandise" shall be determined as follows: the Owner shall present the Presenter a descriptive report of the Owner's existing inventory

{22787363;1}

("Inventory Report"); the Presenter shall have three (3) business days from receipt of the Inventory Report to confirm, in good faith, that such inventory is saleable; and inventory not objected to as being saleable shall be the "Owner's existing salable merchandise." Any dispute concerning whether any inventory is saleable shall be resolved by mediation with Gerald Wetherington or such other mediator as the parties may agree upon. Any merchandise not purchased by the Presenter may be sold by the Owner in any manner it chooses without regard to the exclusivity of the Presenter's merchandise right.

9.3.    The Presenter shall have the right to develop websites in the Territory associated with the Show and Menopause in Concert, including websites for the sale of merchandise ("Presenter websites).

9.4.    The Presenter will assume exclusive administrative control of the following Owner websites during the Term: Menopauseoutloud.com and Menopauseoutloud.ca.

9.5.    At the Owner's expense, prominent links and redirection to websites referenced in Section 9.3 and Section 9.4, shall be provided and maintained on the Owner's websites including Menopausethcmusical.com and Menopauseinconcert.com during the Term of this Production Agreement and License. Specifically, the Owner will construct Menopausethemusical.com and Menopauseinconcert.com so that each address leads to a landing page one-half of which will contain a link that will redirect to "North and South America" (a site which shall be owned and operated exclusively by the Presenter) and one half of which shall contain the Owner's links related to the Show and/or MTM-in Concert outside the Territory (sites which shall be owned and operated by the Owner).

9.6.    The Presenter shall have the right to develop a Facebook page associated with the Show and Menopause-in Concert during the Term. In addition, to the extent the Owner

maintains any such site, the Owner shall make the Presenter an administrator on all Menopause The Musical® Facebook, Twitter and other social media sites under its control for the Term of this Production Agreement and License.

9.7.    The Presenter may sell sponsorships, shall provide the Owner with a copy of all fully executed sponsorship contracts and shall remit 15% of gross revenue from such sponsorships to the Owner within seven (7) days of receipt of payment by the sponsor, together with an accounting of the calculations used to determine the payment amount.

9.8.    All sponsorship contracts shall include the following provision: "Menopause The Musical®, the Owner, J. Jargon Company, and the Author, Jeanie Linders, do not endorse products or services in connection with the marketing of the Show by any sponsor, and the sponsor may not intimate to the contrary in any public statement or material."

## ARTICLE X.  WARRANTIES AND INDEMNITIES

10.1.    The Presenter agrees to indemnify, save and hold the Owner, its managing agents, shareholders, employees, and assignees harmless from and against any and all loss, damage, costs and expenses (including reasonable attorneys' fees) or recoveries (including any amounts paid in settlement with the other party's consent) arising out of or in connection with any claim by a third party which is caused by or arises out of any breach of any of the undertakings or representations made by the Presenter in this Production Agreement and License.

10.2.    The Owner agrees to indemnify, save and hold the Presenter harmless from and against any and all loss, damage, costs and expenses (including reasonable attorneys' fees) or recoveries (including any amounts paid in settlement with the Owner's consent) arising out of or in connection with any claim by a third party, which is caused by or arises out of any breach of any undertakings or representations made by the Owner in this Production Agreement and

{22787363;1}

License.

10.3.   The Owner warrants to the Presenter that the Owner (a) is the sole owner of the rights granted, Marks licensed and Copyrights licensed under this Agreement; (b) is a valid licensee under the Copyright Licenses; (c) has not assigned, pledged or otherwise encumbered any of the rights and licenses granted under this Agreement in the Territory; and (d) has the right and authority to enter into this Production Agreement and License.

### ARTICLE XI.   BILLING CREDITS

11.1.   In all circumstances where the Show title is used, the Owner/Author shall be billed on a separate line directly below the Presenter's billing when and where the Presenter is billed and in a size equal to the Presenter's as: "By special license from the Owner, Jeanie Linders' company." The Owner/Author shall also be billed on a separate line directly below the Show title in all such cases as "Book and lyrics by Jeanie Linders."

11.2.   All programs actually used by the Presenter shall include a brief biography (not to exceed 75 words) and current photo of the Author as provided. The decision to create a program for any particular run or show shall be in Presenter's sole discretion.

### ARTICLE XII.   AUDIT AND ACCOUNTING

12.1.   The Presenter shall keep and maintain true and accurate books and records of account in connection with the Show and Menopause-in Concert and further agrees to retain all such records for a period of not less than five (5) years after the termination of this Production Agreement and License.

{22787363;1}



12.4.   Upon the Presenter's submission to the Owner of a written demand for an accounting from the Music Copyright Holder, the Presenter or its designee shall have the right, upon reasonable notice, at all regular business hours to examine, audit and make copies of Owner's books and records regarding such payments from the Owner's place of business, whether during or after the term of this Production Agreement and License.

12.5.   Any audit expenses incurred pursuant to Section 12.3 or 12.4 above shall be at the initial cost of the auditing party.  In the event that, as evidenced by such audit, any amounts are due to the Owner, such amounts shall be promptly paid, together with whatever penalty or interest the Music Copyright Holder is entitled to.  In the event that, as evidenced by such audit, the Owner failed to transmit to the Music Copyright Holder amounts paid to the Owner under Section 8.2, such amounts shall be promptly paid to the Music Copyright Holder together with whatever penalty or interest the Music Copyright Holder is entitled to.  Further, in the event that any such underpayment is greater than ten (10%) percent of the amount owed, the audited party shall reimburse the auditing party for all costs and expenses of the examination of the books and records revealing such underpayment and all legal fees incurred to collect the same.

### ARTICLE XIII.  BANKRUPTCY; DISSOLUTION; LIQUIDATION

13.1.    This Production Agreement and License shall be and is automatically terminated if the Presenter commences, has commenced against it (and if not discharged within thirty (30) days), or acquiesces in the commencement of any action or proceeding in bankruptcy or seeking the reorganization, arrangement, readjustment of debts, or any other relief under the bankruptcy law whether or not an order for relief has been entered therein.

13.2.    This Production Agreement and License is automatically terminated if the Presenter files a certificate of dissolution under applicable law, is liquidated, or takes any action or has any action taken against it in furtherance of its dissolution or liquidation.

13.3.    In the event this Production Agreement and License is terminated pursuant to this Article, the Presenter or any party involved in this matter cannot sell, assign, exploit or use the Marks or the Copyrights in any manlier.

## ARTICLE XIV.  TERMINATION

14.1.    This Production Agreement and License can be terminated by the Owner for the Presenter's material breach, including *inter alia*:

(a)    The failure of the Presenter to pay t████████on or before February 28, 2012; or

(b)    The failure of the Presenter to pay the██████or before May 28, 2012; or

(c)    The failure of the Presenter to pay the██████Section 8.2 within fourteen (14) days of the conclusion of a theater week (Sunday); or

(d)    Except as provided in Section 3.6., the Presenter's set-off, attempt to recoup or to off-set or otherwise withhold payment of any amount due the Owner; or

(e)    The sub-licensing or engagement of any third party to produce or present

{22787363;1}

the Show or MTM-in Concert without first obtaining the written agreement of such third party to be bound by the terms of this Production Agreement and License.. .

14.2.  Before the Owner may terminate this Production Agreement and License, the Owner shall provide the Presenter with notice in writing and a thirty (30) day opportunity to cure the noticed default, except with respect to the payment of the compensation referenced in Section 14.1(a) and (b) above, as to which there shall be a fifteen (15) day notice and cure period.  The Owner shall be entitled to 5% interest on any amount due but not paid during said 15-day period and, whether or not a termination is declared or is effective, the Owner shall be entitled to 10% interest on any amount due but not paid within the 15-day cure period to 10% interest thereafter.

14.3.  Upon a valid termination of this Production Agreement and License by the Owner, the Presenter shall immediately cease all use of the Marks and the Copyrights.  In such case, the Presenter shall have a period of thirty (30) days from termination to destroy all materials with the Marks and copyrighted materials and to prove destruction of the materials to the reasonable satisfaction of the Owner.  The Presenter shall return all original copyrighted materials to the Owner.

14.4.  This Production Agreement and License can be terminated by the Presenter for the Owner's material breach, including *inter alia*:

(a) The Owner's breach of or declared default under the Copyright Licenses, resulting in a claimed loss of right to utilize the parodied song by the Music Copyright Holder; or

(b) The Owner's production or licensing for production derivative shows (including, *inter alia*, MTM-in Concert or Menopause Extreme) in the Territory during the Term, except as expressly authorized by Section 6.2; or

{22787363;1}

(c) Subject to the principles of *force majeure*, the failure of the Owner to provide such prominent links or to shut down any of the websites referenced in Sections 9.3 through 9.5 shall be a material default of this Production Agreement and License.

14.5.   Before the Presenter may terminate this Production Agreement and License, the Presenter shall provide the Owner with notice in writing and a thirty (30) day opportunity to cure the noticed default.

## ARTICLE XV.   MISCELLANEOUS PROVISIONS

15.1.   This Production Agreement and License cannot be modified, altered, amended or otherwise changed, except by an agreement in writing signed by the parties hereto.

15.2.   This Production Agreement and License shall be binding not only on the parties, but also on their heirs, executors, administrators, successors and assigns.

15.3.   This Production Agreement and License comprises the entire understanding between the parties and replaces all former agreements, understandings and representations with respect to the subject matter of this Production Agreement and License, all such prior agreements, understandings and representations being hereby extinguished in their entirety.

15.4.   No action or inaction by any party shall constitute any waiver of any rights under this Production Agreement and License, and each party expressly retains all rights under this Production Agreement and License not expressly waived in writing.

15.5.   All notices to either party may be sent via Regular Mail or via E-Mail or Facsimile at the addresses set forth below.

**OWNER**
J JARGON CO.
558 W. New England Ave., Suite 250
Winter Park, FL 32789
tocpro@aol.com (e-mail)

{22787363;1}

407-478-1700 (phone)
407-478-3740 (facsimile)

**AUTHOR**
Jeanette C. Linders
558 W. New England Avenue, Suite 250
Winter Park, FL 32715
(tocpro@aol.com (e-mail)
407-478-1700 (phone)
407-478-3740 (facsimile)

**PRESENTER**
G FOUR PRODUCTIONS, INC., a Florida Company
10400 Griffin Road, Suite 103
Cooper City, Florida 33328
kglist@gfourproductions.com (e-mail)
954-680-3000 (phone)
954-680-5243 (facsimile)

15.6.   Each party shall notify the other parties of a change in address, phone, facsimile or email address.

15.7.   In the event of any suit or action to enforce or interpret this Production Agreement and License, the Parties agree (i) to submit themselves to the exclusive jurisdiction of the Broward County Circuit Court; (ii) that such matter shall be conducted without a jury, each party hereto expressly waiving its right to a jury trial; and (iii) that costs and attorneys' fees shall be awarded to the prevailing party in any such suit or action.  If any payment is determined to be due in such suit or action, it shall earn interest at the rate of one percent (1%) per month from the date it was due until such payment is made.

15.8.   Except as provided in Section 1.7 above, this Production Agreement and License or any rights licensed pursuant may not be assigned or otherwise transferred by the Presenter

without the prior written consent of the Owner (such consent not to be unreasonably withheld).

15.9.    Whenever a written consent or approval is required by this Production Agreement and License, an email or email chain which fully details the request and expresses the consent or approval shall suffice.

15.10.    This Production Agreement and License shall be governed by and construed in accordance with the laws of the State of Florida, without regard to conflict of laws.

IN WITNESS WHEREOF, all parties agree to be mutually bound by this Production Agreement and License as of the date set forth above.

**J JARGON COMPANY ("Owner")**

By: _Jeanette C. Linders_                    Dated: _12 · 22 · 11_
    Jeanette C. Linders, President

**JEANETTE C. LINDERS ("Author")**

By: _Jeanette C. Linders_                    Dated: _12 · 22 - 11_
    Jeanette C. Linders

**G FOUR PRODUCTIONS, INC.  ("Presenter")**

By: _Kathi Glist, pres_                    Dated: _12/22/11_
    Kathi Glist, President

## SCHEDULE A
## MARKS

**(1) 'Flying V'**



**(2) Tagline**

The Hilarious
Celebration
of Women and
The Change!

**(3) Girls, color**



**(4) Girls, line art**



**(5) Poster**

 

SCHEDULE B

| Country | Trademark | Class | Item | Registration # | Date of Mark | Date of Renewal | Owned By |
|---|---|---|---|---|---|---|---|
| Brazil | Menopause The Musical | Class 9 | CD | | | | |
| Brazil | Menopause The Musical | Class 25 | Clothing | | | | |
| Brazil | Menopause The Musical | Class 41 | Show | | | | J Jargon Co |
| Brazil | Dancing Ladies | Class 9 | CD | | | | |
| Brazil | Dancing Ladies | Class 25 | Clothing | | | | |
| Brazil | Dancing Ladies | Class 41 | Show | | | | |
| Canada | Menopause Out Loud! | Class 36 | General | ® | TM712,004 | 04/16/08 | J Jargon Co |
| Canada | Dancing Ladies | Class 36 | General | ® | TMA726,001 | 10/14/08 | 10/14/23 | J Jargon Co |
| Canada | The Hilarious Celebration of Women And The Change | Class 36 | General | ® | TMA788,499 | 01/25/11 | 01/25/26 | J Jargon Co |
| Canada | The Off Broadway Musical of Women And The Change | Class 36 | General | ® | TMA735,745 | 03/05/09 | 03/05/24 | J Jargon Co |
| Mexico | Menopause The Musical | Class 9 | CD | ® | 1196874 | 01/17/11 | 08/31/19 | J Jargon Co |
| Mexico | Menopausia El Musical | Class 9 | CD | | | | |
| Mexico | Menopausia El Musical | Class 25 | Clothing | | | | |
| Mexico | Menopausia El Musical | Class 41 | Show | ® | 1093759 | 03/26/08 | 03/26/18 | J Jargon Co |
| Mexico | Dancing Ladies | Class 9 | CD | | | | |
| Mexico | Dancing Ladies | Class 16 | Paper | | | | |
| Mexico | Dancing Ladies | Class 25 | Clothing | | | | |
| Mexico | Dancing Ladies | Class 41 | Show | | | | |
| United States | Menopausia El Musical | Class 36 | General | ® | 77,289,012 | 12/30/08 | | J Jargon Co |
| United States | Menopause The Musical | Class 9 | CD | ® | 3,354,640 | 12/11/07 | 12/11/17 | J Jargon Co |
| United States | Menopause The Musical | Class 20 | Fans | ® | 3,250,841 | 06/12/07 | 06/12/17 | J Jargon Co |
| United States | Menopause The Musical | Class 25 | Clothing | ® | 3,171,313 | 11/14/06 | 11/14/16 | J Jargon Co |
| United States | Menopause The Musical | Class 41 | Show | ® | 2,962,504 | 06/04/05 | 06/14/15 | J Jargon Co |
| United States | Dancing Ladies | Class 9 | CD | | | | |
| United States | Dancing Ladies | Class 20 | Fans | | | | |
| United States | Dancing Ladies | Class 25 | Clothing | | | | |
| United States | Dancing Ladies | Class 41 | Show | | | | |
| United States | The Hilarious Celebration of Women And The Change | Class 9 | CD | ® | 3,354,641 | 12/11/07 | 12/11/17 | J Jargon Co |
| United States | The Hilarious Celebration of Women And The Change | Class 20 | Fans | ® | 3,176,773 | 11/28/06 | 11/28/16 | J Jargon Co |
| United States | The Hilarious Celebration of Women And The Change | Class 25 | Clothing | ® | 3,274,477 | 08/07/07 | 08/07/17 | J Jargon Co |
| United States | The Hilarious Celebration of Women And The Change | Class 41 | Show | ® | 3,171,319 | 11/14/06 | 11/14/16 | J Jargon Co |

## SCHEDULE C

| Copyright | Notes | Name | Date | Reg. # |
|---|---|---|---|---|
| Menopause The Musical® Dramatic Works, Music & Choreography | Book & Lyrics (this copyright is for the play itself) | Jeanie Linders | 06/20/00 | PAu002535888 |
| Menopause The Musical® Recorded Document | | Jeanie Linders & TOC Productions, Inc. | 01/02/00 | PAu2535888 |
| Menopause The Musical® Visual Material | Set Design | Bud Clark | 01/28/04 | VAu000617478 |

| | Updated | 4/10/08 Menopause The Musical - Song List | Licenses Being Paid | Songs from 2005 Program Menopause the Musical | CD Orig | Foreign Citie Toronto |
|---|---|---|---|---|---|---|
| 1 | yes | Beauty Is Only Skin Deep | 100% | Screen Gems-EMI Music, Inc; | | 0% |
| 2 | yes | Don't Say Nothin'Bad | 100% | Screen Gems-EMI Music, Inc; | | 0% |
| 3 | yes | Don't Make Me Over | 50% | Casa David | x | 50% |
| | | Don't Make Me Over | 50% | Warner | x | 50% |
| 4 | yes | Heat Wave | 100% | Rodgers & Hammerstein | na | 0% |
| 5 | yes | I Heard It Through The Grapevine | 100% | Screen Gems-EMI Music, Inc | | 0% |
| 6 | yes | Lookin For Love | 45% | Blue Water for Bob Morrison Music, Inc. & | x | 45% |
| | | Lookin For Love | 55% | Screen Gems-EMI Music, Inc | | 0% |
| 7 | yes | My Guy | 100% | Screen Gems-EMI Music, Inc | | 0% |
| 8 | Yes | Puff The Magic Dragon | 30% | Cherry Lane | | 30% |
| | | Puff The Magic Dragon | 70% | Warner | x | 70% |
| 9 | yes | The Lion Sleeps Tonight | 100% | Larry Spier Music | x | 100% |
| 10 | yes | Wishin and Hopin' | 50% | Casa David | x | 50% |
| | | Wishin and Hopin' | 50% | Warner | x | 50% |
| 11 | yes | YMCA | 100% | Can't Stop Productions, Inc. | x | 100% |
| 12 | yes | California Girls | 100% | Rondor Music International | x | 100% |
| 13 | yes | Good Vibrations | 100% | Rondor Music International | x | 100% |
| 14 | yes | Help Me Rhonda | 100% | Rondor Music International | x | 100% |
| 15 | yes | I'm Sorry | 100% | Universal Music Corp | x | 100% |
| 16 | yes | New Attitude | 100% | Universal Music Corp | x | 100% |
| 17 | yes | Sign Of The Times | 100% | Universal Music Corp | x | 100% |
| 18 | yes | Chain Of Fools | 100% | Warner | x | 100% |
| 19 | yes | I Got You Babe | 100% | Warner | x | 100% |
| 20 | yes | Stayin' Alive | 33.34% | Warner | x | 33.34% |
| | | See below - Not signed | | BMG | | |
| 21 | yes | What's Love Got To Do With It | 50% | Warner | x | 50% |
| | | What's Love Got To Do With It | 50% | Notting Hill | x | 50% |
| 22 | yes | The Shoop Shoop Song | 100% | T/Q Music Co., Inc. | x | 50% |
| | **In negotiations:** | | | | | |
| 23 | yes | Only You | 100% | Cromwell Music OSO Hollis Music | | |
| 24 | yes | The Great Pretender | 100% | Southern Music DBA Peer Music | | |
| 25 | | Night Fever | 100% | BMG | | |
| 20 | part of | Stayin' Alive | 66.66% | BMG | | |